[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
This is an action for dissolution of marriage and other relief brought to the judicial district of Waterbury. The defendant has filed a third party complaint against the plaintiff's father and the plaintiff's brother alleging that both third party defendants have conspired and/or cooperated with the plaintiff to receive transfers of substantial funds from the plaintiff in the form of brokerage accounts and/or securities with the sole purpose of the transfer of said assets to frustrate and avoid the legitimate claim of the defendant to an equitable distribution of marital assets by removing said assets from the jurisdiction of this court.
Many of the facts that give rise to the dissolution action are not in dispute. The plaintiff whose maiden name was Karen Baldowski and the defendant were married on June 20, 1986 in Prospect, Connecticut. The plaintiff has resided continuously in the State of Connecticut for at CT Page 10027 least one year immediately prior to the date the complaint was filed. The marriage between the parties has broken down irretrievably without any reasonable prospects of reconciliation. There are two minor children issue of this marriage, Scott Chicoine born December 3, 1989 and Kristen born November 16, 1992. The plaintiff does not have any other minor children who were born since the date of the marriage of the parties and neither party has received state assistance.
From the evidence presented the court finds that the defendant is primarily at fault for the breakdown of the marriage.
The plaintiff was born on April 21, 1959. The plaintiff graduated from Quinnipiac College with a Bachelor's in Medical Technology.
The plaintiff is employed as a medical technician at St. Mary's Hospital. She has been a medical technician since 1981.
The plaintiff presently resides with the two children at 77 Central Avenue, Wolcott, Connecticut. Her monthly rent is $995. She vacated the family residence located at 669 High Street, Naugatuck, Connecticut in mid-December, 2000.
The parties purchased in both names a 1995 Ford Aerostar in 1996. The total purchase price was approximately $32,000. The vehicle had been leased for approximately one year by the parties prior to it's purchase. A $5,000 down payment was made towards the purchase price that came out of a joint account. The funds in the joint account came from the plaintiff's inheritance money. The plaintiff drives that vehicle. The Aerostar has a fair market value of $13,500. The plaintiff also owns in her name a 1987 GMC Truck with a value of $500. The truck was purchased in 1987.
The plaintiff has a debt to Dr. Gottlieb for braces for the minor child, Scott. She pays that debt in bi-monthly installments. The $3,975 is the full bill. There will be some insurance coverage, the exact amount being unknown. As of February, 2001, there is an arrearage on the mortgage on 669 High Street, Naugatuck, Connecticut in the amount of $995. Her financial affidavit shows a debt for security deposit in the amount of $1,990. The actual amount of that debt is $1,592. The plaintiff also owes money for attorney's fees. The plaintiff has a gross weekly income of $1,040. She shows gross weekly expenses of $1,398. The weekly expenses regarding utilities except for cable t.v. and telephone together with the weekly expense for the mortgage are all for 669 High Street, Naugatuck, Connecticut. The food and clothing weekly expense of $200 is for herself and the two children. The automobile expense of $20 weekly for insurance premium is for the van only. She shows in schedule B of her CT Page 10028 financial affidavit weekly expenses totaling $686. The children's tuition expense of $83 weekly is for Scott to attend St. Mary's School. The total cost to attend that school per year for the two children is $3,850. In addition, there are some uniform and computer fees. The defendant has been paying $175 weekly support and the plaintiff has not sought his help regarding the St. Mary's School expenses.
The plaintiff has a joint checking account at Webster Bank in her name and her aunt's name with a balance of $16,000. That account represents the balance of the funds that she inherited from her uncle, Henry Cabana after he died in 1995. Her aunt has no interest in that account. The plaintiff had a certificate of deposit at Webster Bank from funds that she inherited from her uncle with a balance of approximately $50,000 on April 13, 1999, and another Certificate of Deposit from funds that she inherited from her uncle with a balance of approximately $14,000 at Fleet Bank. Both Certificates of Deposit were in the plaintiff's name and the defendant's name. She transferred those two certificates of deposit to an account in her name and that of her aunt at Webster Bank approximately one month before filing for divorce. Since filing for divorce she has spent approximately $50,000 from the Webster Bank account. She has not adequately explained the use of that $50,000.
The plaintiff has a stock account in her name and the name of her brother, Gary Baldowski with a present balance of $10,660. The parties are in dispute as to whether that account is owned by the plaintiff and her brother or whether the account is actually owned by the plaintiff's father. This account was set up in July, 1998 in the name of "Karen R. Chicoine and Gary Baldowski, joint tenants". The initial investment to set up this account was $8,850. The funds came from the plaintiff's father. The court finds that the plaintiff and her brother do not hold that account in trust for her father.
The plaintiff has a Hartford Capital Appreciation Fund stock account with a present value of $50,085. This is a joint account in her name and her husband's name. This account was started with $30,000 from funds that she inherited from her uncle. The Hartford Capital account was purchased September 29, 1997.
The plaintiff has three deferred compensation plans. One is an IRA with a balance of $43,158, the second is a 403B with a balance of $29,882 and third is a 401K with a balance of $39,344.
On October 22, 1984, almost two years before the parties married, the plaintiff transferred bank funds in the total amount of $4,578.93 to open an IRA at First Federal Savings and Loan Association of Waterbury. In 1985, the plaintiff deposited an additional $330 into that IRA. On CT Page 10029 January 1, 1985, the IRA had a balance of $5,098.98. On June 27, 1985, the IRA had a balance of $6,497.93. On October 25, 1985, the plaintiff opened up an IRA with First Federal Savings with an opening balance of $4,603.12. This IRA had the same account number, 4010405, as the account that had a balance of $6,497.93 on June 27, 1985.
The plaintiff had an IRA with First Federal Savings and Loan with a calendar year 1987 year-end balance of $10,316.23. That same account number 40409759 had a balance for the period ending June 30, 1991, in the amount of $14,255.14. The account balance that the plaintiff had with First Federal Savings Loan for account 40409759 as of June 30, 1993 was $16,233.41. In October, 1994, the plaintiff closed out an account that she had at First Federal in the amount of $17,379.29. The $17,379.29 was transferred to three separate accounts through Warburg Pincus Funds. One such transfer was in the amount of $4,373.51 and was completed on November 2, 1994. A second transfer from the $17,379.29 was made to Equity Fund on October 25, 1994 in the amount of $6,500. A third transfer was made to Newberger and Berman on November 7, 1994 in the amount of $6,500. The present value of these three accounts is shown on the plaintiff's financial affidavit dated February 15, 2001, under the category of IRA is $43,158.00. There have been no IRA contributions between 1991 and the present date.
The balance that the plaintiff has in her 403b deferred compensation account of $29,882 is as a result of funds that she saved since she married the defendant.
The balance that the plaintiff has in her 401K in the amount of $39,344 is as a result of funds that she saved since she married the defendant.
The defendant was born on February 5, 1959. The defendant is a high school graduate.
The defendant is employed as a machinist.
The defendant presently rents premises located at Sky Hollow Court, Waterbury, Connecticut.
The defendant owns a 1994 Harley Davidson Fat Boy motorcycle. It has a fair market value of $8,000 and no loan balance. The motorcycle was purchased by the plaintiff. She used a CD that she owned prior to the marriage between the parties. The motorcycle was purchased on September 30, 1993, for $14,000. The defendant also owns a computer with a fair market value of $1,500 that he purchased after the plaintiff filed for divorce. He owns a 1981 snowmobile with an approximate value of $600, sporting equipment with an approximate value of $700 and power tools with CT Page 10030 a value of $500. He has a savings account at Thomaston Savings Bank with a balance of $65. He also has a checking account at Corporate America C.U. that is used to pay bills. He has a $100,000 life insurance policy through Mass. Mutual with a cash surrender value of $5,975.00 and a $30,000 life insurance policy through Northwest Mutual with a cash surrender value of $6,660. His financial affidavit of February 15, 2001, lists a pension plan through Siemens with no current cash value. The parties have since stipulated that the present value of that pension plan is $10,361 and the court finds that it's present value is $10,361. He also has a Siemens Savings Plan 401K with a present value of $10,962. He took loans on his 401K plan totaling $11,500. If those loans had not been taken the value of his 401K plan would be $22,462. Approximately $9,000 of the 401K loan was used to pay attorney's fees. He also owns a 1991 Lincoln Sedan with a present value of $1,800 and no loan balance.
The parties own a marital home located at 669 High Street, Naugatuck, Connecticut. It has a fair market value of $99,500 and a first mortgage with an outstanding balance of approximately $56,000 and equity of approximately $43,500. The property was purchased jointly in 1986 for $161,000. There was a $50,000 down payment towards the purchase of the family home. The plaintiff's father had previously owned a home in Prospect, Connecticut that he transferred to the plaintiff and her brother. Her brother paid her $50,000 for her one-half interest in the home and the plaintiff used that $50,000 as a down payment for the family home located at 669 High Street, Naugatuck, Connecticut. That home is presently vacant. The home is in need of repairs.
The parties own an unimproved lot on Stoddard Road, Morris, Connecticut. It has a fair market value of $100,000 and a first mortgage with a balance of approximately $44,000 and equity of approximately $56,000. The property was purchased jointly in 1996 for $94,000.
The plaintiff inherited approximately $150,000 from her uncle Henry Cubana. She received the funds in late 1995 or early 1996. $30,000 of those funds were used as the down payment to purchase the Stoddard Road, Morris, Connecticut property. Approximately $15,000 to $17,000 of the funds inherited from the plaintiff's uncle was also used towards paying the balance due on a motor vehicle.
The plaintiff is the custodian of an account set up for the minor child Kristine Chicoine under the Uniform Gift to Minor Act with Selected Funds. That account was funded with gifts as well as money from the plaintiff's paycheck. The defendant did not contribute to funding that account. The present value of that account is approximately $30,000. On February 28, 1994, the plaintiff's father wrote out one check to the plaintiff in the amount of $10,000 for an educational trust for his CT Page 10031 grandson Scott and a second check was made out to the plaintiff on February 28, 1994, in the amount of $10,000 for an educational trust for his granddaughter Kristine. The plaintiff invested those funds in stocks. The plaintiff is the custodian of the account for Kristine through Edward Jones and that account has a balance of approximately $34,276 as of June 30, 2000. The plaintiff is also the custodian of an account for the minor child Scott at Edward Jones. That account has a balance of $23,502 as of September 24, 1999. The plaintiff is also the custodian of another account for Kristine at Selected American funds with a balance of approximately $30,000.
The plaintiff argues that the defendant is not entitled to any portion of her Webster checking account with a balance of $16,000 or her Hartford Capital Appreciation Fund with a balance of $50,085 as they were all part of her inheritance from her uncle. She also argues that the defendant is not entitled to any portion of her deferred compensation plans consisting of an IRA with a balance of $43,158, her 403b with a balance of $29,882 or her 401k with a balance of $39,344 as they were not funded during the marriage. The court is not persuaded by that argument.
The court finds the following facts by clear and convincing evidence regarding the defendant's third party complaint.
The Janis fund was an account that the plaintiff's father wanted to invest in. It was set up at about the same time as the Strong and Waterhouse accounts. As was the case with the Strong and Waterhouse accounts the funds for the Janis account were transferred from her father's money in order to invest in the account. The account was set up in the name of the plaintiff and her brother. She transferred the money in the Janis fund back to her father before the divorce case started.
The plaintiff's father wanted to invest in the Strong Funds. The plaintiff withdrew money from her father's account and invested it in her name and her brother's name, Gary Baldowski. Approximately one month before she filed for divorce, she transferred the fund back to her father.
There was also an account with Waterhouse in the name of the plaintiff and her brother. That account was also transferred back to her father in approximately April or May of 1999. Her father gave her directions as to what stocks to buy in the Waterhouse account. The plaintiff did not make any decisions on her own about buying or selling stocks in that account. She considered it to be her father's money and her father controlled the account.
Her father was still working at the time the divorce action started and CT Page 10032 was 76 years old. The taxable dividends or interest on the Janus, Strong and Waterhouse Funds were paid by the plaintiff and the defendant as well as by the plaintiff's brother. Her father would then reimburse her as well as reimburse her brother for the amount of taxes that she and her brother paid resulting from interest and dividends from those three accounts. The Janus. Strong and Waterhouse accounts were set up with the agreement between the plaintiff, her brother and her father that in the event her father needed any of the money from those three accounts either for illness or as a result of being placed in a home or for medicine or for any other purpose That the accounts would then be used for those purposes. It was the plaintiff's father's idea that the funds for the three accounts be placed in the names of the plaintiff and her brother. Her father trusted her as well as her brother. The plaintiff and her brother considered the three accounts to all be funds of their father as long as he was alive, and on his death any remaining balance was to be divided equally between the plaintiff and her brother. Neither the plaintiff or her brother ever took any of the funds from any of the three accounts for their own use. The plaintiff's father considered the Janus, Strong and Waterhouse accounts to be owned by himself. It was difficult for the plaintiff's father to place buy or sell orders himself due to his impaired hearing. Putting the three accounts in the name of the plaintiff and her brother was a convenience to the plaintiff's father.
In Gaudio v. Gaudio, 23 Conn. App. 287 (1987), the Court at page 307 held in part as follows:
 "General Statutes § 52-522. Connecticut's fraudulent conveyance statute, provides: "All fraudulent conveyances . . . made or contrived with intent to avoid any debt or duty belonging to others, shall, notwithstanding any pretended consideration therefor, be void as against those persons only . . . to whom such debt or duty belongs." Under this statute, a person wishing to avoid an alleged fraudulent conveyance has the burden of proving either constructive fraud or actual fraud. Patrocinio v. Yalanis, 4 Conn. App. 33, 35, 492 A.2d 215 (1985). To prove constructive fraud, a plaintiff must show that the conveyance was made without substantial consideration and that the conveyance rendered the transferor unable to meet an obligation to the plaintiff. Id.; Zapolsky v. Sacks, 191 Conn. 194, 2000, 464 A.2d 30 (1983). Actual fraud requires a showing that the conveyance was made with a fraudulent intent and that the transferee of the property participated in the fraud. Id. In either instance, CT Page 10033 fraud must be proven by clear and convincing evidence. Patrocinio v. Yalanis, supra. (Emphasis Provided.)
In Gaudio the Court held in part at page 309 as follows:
 We first address Eannelli's claim that the trial court did not make a finding of constructive fraud. Specifically, he contends that the court failed to find that the stock transfer rendered Gaudio "insolvent," which, he claims, is an element of constructive fraud. We have already concluded, however, that in the context of a dissolution action, such a finding is not required. "While neither marriage nor an action for dissolution serves, in and of itself, to transfer an interest in property from one spouse to another . . . the institution of judicial proceedings serves, at least between the parties, to preserve the status quo from impairment by fraud." (Citations omitted.) Molitor v. Molitor,
supra, 534. In other words, once a dissolution action is filed. any transfer of assets for insubstantial consideration reduces the amount of the marital estate and frustrates the equitable distribution of property. This is particularly true in the case where a property settlement or lump sum alimony is sought instead of periodic alimony. We conclude that the trial court had sufficient evidence to support a finding of constructive fraud. (Emphasis Provided.)
In this case the court finds that the transfers of the Janus account, Strong account and Waterhouse account by the plaintiff does not constitute either constructive or actual fraud. The court finds that the conveyances of the three accounts were not made with a fraudulent intent. The court also finds that the conveyances did not render the plaintiff unable to meet any obligations that she might have to the defendant. The court further finds that the three accounts would not have been considered in determining the issue of alimony or property if those three accounts had remained in the names of the plaintiff and her brother. The court finds that the interest that the plaintiff held in the three accounts was a mere expectancy and not subject to division. There is no credible evidence as to what amount she would ultimately inherit from those three accounts upon the death of her father. Any or all of those three accounts could have been totally paid out to the plaintiff's father prior to his death for his own purposes. Therefore, the transfer of those assets did not reduce the amount of the marital estate that CT Page 10034 would have been subject to distribution at this time.
This court has considered the provisions of § 46b-82 regarding the issue of alimony, and has considered the provisions of § 46b-81 (c) regarding the issue of property orders, and has considered the provisions of § 46b-84 and the Child Support Guidelines regarding the issue of support, and has considered has considered the provisions of § 46b-84
and the Child Support Guidelines regarding the issue of support, and has considered the provisions of § 46b-56 regarding the issues of custody and visitation, and has considered the provisions of § 46b-62
regarding the issue of attorneys' fees. The court enters the following orders:
 ORDERS
A. BY WAY OF DISSOLUTION OF MARRIAGE
1. The marriage between the parties is dissolved and each party is declared to be single and unmarried.
B. BY WAY OF ALIMONY
1. No alimony is awarded in favor of either party.
C. BY WAY OF CUSTODY AND VISITATION
1. The parties entered into a custody/visitation stipulation dated March 20, 2001, which the court has reviewed and finds to be in the best interests of the children. The court enters orders in accordance with that stipulation. A copy of that stipulation is attached to this memorandum of decision and is incorporated by reference.
D. BY WAY OF SUPPORT
1. The custody/visitation stipulation entered into between the parties dated March 20, 2001, also has provisions in paragraph 3 for medical insurance coverage, provisions in paragraph 4 for support and wage withholding, and provisions in paragraph 5 for tax exemption. The court finds that all of those Provisions are in the best interests of the children and in accordance with Child Support Guidelines and therefore enters orders in accordance with those paragraphs.
E. BY WAY OF PROPERTY ORDERS
1. All of the liabilities shown on the plaintiff's financial affidavit are to be paid by the plaintiff and she is to hold the defendant harmless CT Page 10035 therefrom.
2. The 1995 Ford Aerostar shown on the plaintiff financial affidavit is awarded to the plaintiff. The defendant is to transfer all his right, title and interest in that vehicle by August 20, 2001. The plaintiff is to prepare the necessary documents for that transfer.
3. All of the miscellaneous furniture, furnishings and household contents shown on the plaintiff's financial affidavit in possession of the plaintiff is awarded to the plaintiff.
4. The Webster checking account shown on the plaintiff's financial affidavit is awarded solely to the plaintiff.
5. The Hartford Capital Appreciation Fund shown on the plaintiff's financial affidavit is ordered divided equally between the parties.
6. The IRA shown on the plaintiff's financial affidavit is awarded solely to the plaintiff. The 403b shown on the plaintiff's financial affidavit is ordered divided equally between the parties. The 401K shown on the plaintiff's financial affidavit is awarded solely to the plaintiff.
7. The court enters no orders changing the name of the trustee of the various children's custodial accounts. The court also enters no orders regarding the savings bonds being held by the defendant that are in the names of the children.
8. The cash surrender value shown on the plaintiff's financial affidavit in her life insurance policies totaling $4,327 is awarded to the plaintiff.
9. The 1987 GMAC pickup truck shown on both parties' financial affidavits is awarded to the defendant. The plaintiff is to transfer title to that vehicle to him by August 20, 2001. The defendant is to prepare the necessary documents to transfer this title.
10. The 1994 Harley motorcycle shown on the defendant's financial affidavit is awarded to the defendant.
11. The 1990 or 1991 Lincoln motor vehicle shown on the defendant's financial affidavit is awarded to the defendant.
12. All of the liabilities shown on the defendant's financial affidavit are to be paid by the defendant and he is to hold the plaintiff harmless therefrom. CT Page 10036
13. The 1981 snowmobile with an approximate $600 value, the sporting equipment with an approximate $700 value, the power tools with an approximate $500 value, and the computer with an approximate $1,500 value, all shown on the defendant's financial affidavit are awarded to the defendant.
14. The Thomaston Savings Bank account shown on the defendant's financial affidavit with a balance of $65 is awarded to the defendant.
15. The cash surrender value on the two life insurance policies in the defendant's name totaling $12,635 is awarded to the defendant.
16. The Siemens savings plan 401k plan shown on the defendant's financial affidavit with a value of $10,962 is awarded to the defendant.
17. The Siemens pension plan that the defendant's financial affidavit lists as having no current value which, in fact, has a value of $10,361 is awarded solely to the defendant.
18. All of the plaintiff's interests in the Philadelphia Suburban Mutual Fund is awarded to the plaintiff.
19. The court orders that the property located at 669 High Street, Naugatuck, Connecticut as well as the land located in Morris, Connecticut be sold with the net proceeds divided equally between the parties. The term "net proceeds" is intended to mean the gross sale price less the payment of the mortgage, less any real estate commission and less any usual closing adjustments such as but not limited to real estate taxes, fuel oil, and conveyance taxes. The court retains jurisdiction over any dispute that may arise regarding the sale of either or both of these properties.
F. BY WAY OF ATTORNEYS' FEES
1. No attorneys' fees are awarded in favor of either party.
G. MISCELLANEOUS ORDERS
1. Counsel for the plaintiff is to prepare the judgment file within thirty days and send it to counsel for the defendant for signature and filing.
2. The parties are to exchange copies of their federal and state income tax returns for so long as there is an outstanding support order or any arrearage thereto. CT Page 10037
3. Any security deposit that either party has placed for the premises they presently occupy is awarded to that party.
H. BY WAY OF THIRD PARTY COMPLAINT
1. All of the requested relief is denied.
AXELROD, J.